UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

LEROY JOHNSON                           CIVIL ACTION

VERSUS                                  NO: 06-0914

CENAC TOWING INC., ET AL.               SECTION: "R"(2)

## ORDER AND REASONS

The Court commenced a two-day bench trial on plaintiff's claims of negligence under the Jones Act, 46 U.S.C. app. § 688, and unseaworthiness under general maritime law against Cenac Towing on December 4, 2006. This Court has original jurisdiction over this matter pursuant to the Jones Act, 46 U.S.C. app. §§ 688, *et seq.*, and the Court's admiralty jurisdiction under 28 U.S.C. § 1333. The substantive law applicable to this case is prescribed by the Jones Act and general maritime law of the United States. After hearing live testimony and reviewing all the evidence, the Court rules as follows. To the extent a finding of fact constitutes a conclusion of law, the Court adopts it as such. To the extent a conclusion of law constitutes a

finding of fact, the Court adopts it as such.

**I.    FINDINGS OF FACT AND CONCLUSIONS OF LAW**

    **A.    Background**

Plaintiff Leroy Johnson brought this action under the Jones Act and general maritime law as a result of injuries he sustained while carrying a crossover hose aboard barges being transported by the vessel M/V URSULA CENAC, which is owned by defendant Cenac Towing.[1]  At the time of the accident, Cenac Towing employed Johnson as a tankerman aboard the URSULA CENAC.[2]  Johnson qualified as a seaman under the Jones Act.[3]  Johnson began working for Cenac Towing as a tankerman in May 2003, after having worked as a tankerman for other offshore companies off and on for approximately thirteen years.[4]  Johnson initially worked for Cenac Towing from May 27, 2003 to May 3, 2004, when he was terminated for failure to report for scheduled crew change and was listed as "No Rehire."[5]  He then returned to work for

_____

[1] Pre-Trial Order, at pp. 23-24.

[2] Pre-Trial Order, at p. 24.

[3] Pre-Trial Order, at p. 24.

[4] Testimony of Leroy Johnson; Def's. Ex. 2.

[5] Pl.'s Ex. 14, at p. 18.

defendant from May 2005 until December 14, 2005.[6]  Johnson also had performed construction work, including welding, pipefitting, and painting.[7]  Johnson testified that he quit school in the 11th grade.[8]  However, he reported on his Cenac Towing employment applications that he had completed high school.[9]  At the time of the accident, Johnson was 35 years old.[10]  He has been married for seven years and resides with his wife and four children, the youngest of which was born in early 2005.[11]

**B.  Plaintiff's Prior Injuries**

Johnson had been injured twice in on the job incidents before he went to work for Cenac Towing.  First, on September 11, 1994, Johnson struck an electric wire with a hammer, as he was mixing chemicals, when he worked for Sonat Offshore.[12]  Johnson was thrown backwards, after which he immediately noted right arm and lumbosacral pain, followed by cervical pain within one week

---

[6] Testimony of David Bourgeois.

[7] Testimony of Leroy Johnson.

[8] *Id.*

[9] Def.'s Ex. 2 & 3.

[10] Testimony of Leroy Johnson.

[11] *Id.*

[12] Def.'s Ex. 35, at p. 11.

of the accident.[13]  He was diagnosed with a chronic lumbar strain and a herniated cervical disc at the C3-C4 level.[14] Additionally, a defect was noted at the C4-C5 level.[15]  As a result, Johnson received an anterior cervical fusion at C3-C4 on July 26, 1995.[16]  Johnson also testified in his deposition, though he did not recall doing so at trial, that he experienced bladder control problems for the first time after this accident.[17]  Johnson obtained compensation benefits for his injuries, and ultimately filed suit and collected damages from his employer as a result of this incident.[18]  He was disabled for at least ten months after this accident.[19]

On February 8, 2001, while working as a tankerman for Adams Land & Marine, Ltd. at a Shell Oil facility, Johnson fell when the metal stairs on which he was walking broke.[20]  On the night of the accident, Johnson visited the emergency room at Prevost

---

[13] *Id.*

[14] *Id.* at p. 12.

[15] *Id.*

[16] *Id.* at pp. 8-9; *see also* Testimony of Leroy Johnson.

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.; see also* Def's. Ex. 8, at p. 1.

Hospital in Donaldsonville, Louisiana.[21]  Johnson reported

injuries to his lower back, hip, and leg.[22]  His physician noted

a month after the accident: "He states that before the accident

he had no bladder problems and completely normal erectile

function.  However, since the accident he has had changes noted.

Therefore a urological consultation is necessary for this

patient."[23]  On June 11, 2001, Johnson received lumbar steroid

injections to treat his low back pain.[24]  He was later diagnosed

with a central bulging disc at the L5-S1 level on June 27,

2001.[25]  Johnson obtained compensation benefits for his injuries

sustained in this accident, and he ultimately filed a lawsuit

against Adams Land & Marine and collected damages.[26]  As a result

of this accident, Johnson was disabled for approximately 13

months until May 2002.[27]

On July 18, 2002, Johnson was injured while riding his

---

[21] Testimony of Leroy Johnson.

[22] Def.'s Ex. 8, at p. 1.

[23] *Id.* at p. 2.

[24] Def.'s Ex. 9, at p. 27.

[25] *Id.* at p. 29.

[26] Testimony of Leroy Johnson.

[27] *Id.*

motorcycle on Highway 1 in Assumption Parish.[28]  Johnson crashed into a motor vehicle that was backing out of a driveway onto the road.[29]  He was ejected from the motorcycle and landed ten feet from where his motorcycle came to rest.[30]  Johnson was evacuated from the scene by ambulance on a spine board.[31]  Eventually, Johnson retained an attorney and filed suit as a result of this accident.[32]

### C.   Cenac Towing's Pre-Employment Procedures

Johnson filled out an employment application before both of his periods of employment with Cenac Towing.[33]  On both his 2003 and 2005 applications, Johnson was asked: "Do you have any physical or mental condition(s) which may interfere with or hinder the performance of the job for which you wish to be considered?  If so, please explain."  He responded "No."[34]  On both of the employment applications, Johnson was also asked:

---

[28] *Id.; see also* Def.'s Ex. 11.

[29] *Id.*

[30] *Id.*

[31] Testimony of Leroy Johnson.

[32] *Id.*

[33] Def.'s Ex. 2 & 3.

[34] *Id.*

"Have you ever had an on the job injury?"  He responded "No."[35]
On both of the employment applications, Johnson was provided
space to describe any "on the job" injuries that he might have
sustained.  Each time, he wrote "N/A" in that space.[36]

Before both of his periods of employment with Cenac Towing,
Johnson underwent a pre-employment medical examination that
included a physical exam, a range of motion test and a back x-
ray.[37]  As part of these pre-employment physicals, medical
personnel asked Johnson a series of questions.[38]  Johnson
responded to the question "Hurt your back?" by checking "No."[39]
Johnson responded to the question "Had surgery?" by checking
"Yes" and explaining that he had a shoulder A/C joint injury in
1987.[40]  Johnson responded to the question "Received disability
compensation?" by checking "No."[41]

At the conclusion of both medical examinations, the examiner

---

[35] *Id.*

[36] *Id.*

[37] Testimony of Leroy Johnson; Testimony of David
Bouregeois.

[38] Def.'s Ex. 4 & 5

[39] *Id.*

[40] *Id.*

[41] *Id.*

noted "normal back x-rays" and determined that Johnson could be considered for "employment without restriction."[42]  Dr. Mark Walker, who administered plaintiff's two physical examinations on behalf of Cenac Towing, stated that had he known of plaintiff's 1994 and 2001 accidents, he would not have approved plaintiff for employment because of "the possibility of further endangering himself in any kind of way . . . in this case his neck and his back and to try to protect others around him."[43]

Johnson admitted at trial that he intentionally concealed from Cenac Towing and its medical personnel his earlier injuries, disabilities and pre-existing medical conditions, including surgeries and hospital visits, when he applied for the tankerman position in 2003.[44]  Johnson added, however, that when he re-applied for a job with Cenac Towing the second time in 2004, a Cenac employee told him that he needed only to disclose injuries that had occurred within the previous six months, because the company still had his previous application on file.[45]  The Court does not find this aspect of Johnson's testimony credible.  The

---

[42] *Id.*

[43] Deposition Testimony of Dr. Mark Walker.

[44] Testimony of Leroy Johnson.

[45] *Id.*

8

testimony and other evidence, in addition to his answers on Cenac
Towing's employment applications, showed that Johnson was
consistently not forthcoming about his previous medical
conditions.  For example, when filling out a patient
questionnaire before seeing Dr. Bradley Bartholomew in February
2006 about a potential neck injury, Johnson did not report that
he had any prior history of back trouble or disc trouble.[46]
Likewise, Johnson did not tell his urologist, Dr. Susan McSherry,
about his 2001 offshore accident, despite his complaints of
urological issues following that accident.[47]  Johnson also told a
treating physician one day after the accident that is the subject
of this lawsuit that he had no previous back or spine injuries
and no previous incontinence.[48]  Additionally, when Johnson
visited with his own expert vocational evaluator Bobby Roberts,
he did not report the 2001 offshore accident or a 2006 motor
vehicle accident in which he was injured.[49]  Even if it were true
that an employee of Cenac Towing told him that he needed only to
disclose injuries that had occurred within the previous six

---

[46] Def.'s Ex. 14, at p. 105.

[47] Testimony of Dr. Susan McSherry.

[48] Testimony of Dr. Kirk Dantin.

[49] Testimony of Bobby Roberts.

months, that instruction obviously assumed that he had provided a correct medical record with his first application, such that he only needed to supplement this record with any new injuries that may have occurred since he last worked for Cenac Towing in 2004. The Court therefore finds that Johnson intentionally concealed from Cenac Towing and its medical personnel his earlier injuries, disabilities and pre-existing medical conditions, including surgeries and hospital visits, when he applied for the tankerman position in 2005.

Despite his previous injuries, Johnson had performed work that involved heavy lifting from 2002 until his December 14, 2005 accident without any difficulty.[50]

### D.   Day Before Accident

Deckhand/tankerman trainee Kevin Ahysen, who along with plaintiff worked for Cenac Towing aboard the URSULA CENAC, testified that on December 13, 2005, in a conversation aboard the vessel, Johnson told him that "if he got the opportunity to get a lawsuit, he was going to take it."[51]  According to Ahysen, Johnson did not mention during that conversation any of the earlier maritime injuries that he had sustained, or any previous

---

[50] Testimony of Leroy Johnson.

[51] Deposition Testimony of Kevin Ahysen.

10

maritime lawsuits he had filed.[52]  Johnson testified that he did
not tell Ahysen that he was looking for an opportunity to file a
lawsuit against his employer.

The Court finds that Ahysen's testimony, if true, does not
show that Johnson faked his accident and injuries.  Given the
accident-riddled nature of offshore work, the Court does not find
it unusual that personal injury lawsuits would be a topic of
discussion among crew members.  Johnson's comments indicate only
an intention to exercise his rights if he had a claim against the
company.  The Court does not see any credible evidence that
Johnson's intention was to trump up an accident and file a
fraudulent claim.

### E.   December 14, 2005 Accident

On December 14, 2005, Johnson was assigned to the URSULA
CENAC.[53]  The vessel was towing the barges CTCO-3019 and CTCO-
3021, both owned and operated by Cenac Towing.[54]  Besides
Johnson, the crew on that date consisted of Captain John Theriot,
Wheelman Kelly Sauerwin, Tankerman Louis Celestine, and

─────────────────

[52] *Id.*

[53] Pre-Trial Order, at p. 24.

[54] *Id.* at p. 23.

Deckhand/Tankerman Trainee Kevin Ahysen.[55]  On the day of the accident, the URSULA CENAC and its barges were standing by for dock space in Mobile, Alabama.[56]

At approximately 1:00 p.m., Johnson, Celestine, and Ahysen initiated the process of connecting the crossover hose between the two barges.[57]  Although they were not ordered to connect the crossover hose, the crew knew that, at some time before docking in Mobile, Alabama, they would have to connect the crossover hose before product could be loaded aboard the barges.[58]  The crossover hose is used to connect the two barges to allow for discharge or loading of product.  The task of connecting and disconnecting the crossover hose is routinely performed by deckhands and tankermen.[59]  The URSULA CENAC's crossover hose was approximately 25 feet long and six inches in diameter.[60]  A six-inch crossover hose of the kind used by Cenac Towing weighs

---

[55] *Id.* at p. 24.

[56] *Id.* at p. 25.

[57] Testimony of Leroy Johnson; Testimony of Louis Celestine; Deposition Testimony of Kevin Ahysen.

[58] *Id.*

[59] *Id.*

[60] Testimony of John Theriot.

approximately 175 pounds.[61]  The end of the crossover hose is heavier than the middle because the end has an iron flange.[62] Usually, a deckhand and a tankerman work together to move and connect the crossover hose between the two barges, which are positioned alongside each other.[63]

In order to connect the crossover hose, a worker had to move it from its storage location inside the spill rail of one of the barges.[64]  Johnson and Celestine lifted the hose, as Ahysen prepared to connect the hose once it was moved into position.[65] Johnson testified that he then started to carry the flange end of the hose on his right shoulder, as Celestine carried the belly of the hose.[66]  Johnson said he carried the hose on his shoulder because it was more comfortable for him.[67]  He stated that he had never been trained by Cenac Towing not to carry the hose on his

---

[61] Pl.'s Ex. 9, at p. 4.

[62] Testimony of John Theriot.

[63] Testimony of Kelly Sauerwin; Deposition Testimony of Kevin Ahysen.

[64] Testimony of Leroy Johnson.

[65] *Id.; see also* Deposition Testimony of Kevin Ahysen.

[66] Testimony of Leroy Johnson.

[67] *Id.*

shoulder.[68]  Cenac Towing did not have any written procedures for
lifting and carrying a crossover hose.[69]  Cenac Towing required
new employees to watch a training video that briefly included the
topic of lifting and carrying a crossover hose.[70]  The video
showed crew members carrying the hose at waist level while the
phrase "utilize proper lifting techniques" flashes across the
screen.[71]  There is no accompanying audio that describes the
proper procedure for carrying a crossover hose.

As Johnson and Celestine moved the hose, Celestine tripped
on a hatch cover located aboard one of the barges that was
clearly visible to him at the time.[72]  As a result, he dropped
the part of the hose that he was carrying and it landed on top of
his legs.[73]  Johnson was left to bear an increased amount of the
weight of the hose, and Celestine heard him exclaim that he had
hurt his back.[74]  Ahysen then assisted Celestine to lift the hose

---

[68] *Id.*

[69] Testimony of Kelly Sauerwin; Testimony of John Theriot.

[70] Pl.'s Ex. 16 & 17.

[71] *Id.*

[72] Testimony of Louis Celestine.

[73] *Id.*

[74] *Id.*

14

off of Celestine's legs.[75]  Celestine recalled looking over at
Johnson and seeing Johnson bent over "like when you lose your
breath."[76]  Johnson stated that right after the accident happened
his back started to burn, and he told Celestine and Ahysen that
he had to return to the boat to seek medical help.[77]  At some
point shortly after Johnson returned to the boat, he said that he
noticed a wet spot in his underwear, but he did not mention that
to anyone aboard the vessel.[78]

Back at the boat, Johnson spoke with Wheelman Kelly Sauerwin
about the accident, and the two men filled out an "On Board
Accident Investigation" report.[79]  Sauerwin also called Cenac
Towing's human resources manager, David Bourgeois, at this time
to inform him that Johnson had been injured.[80]  Ahysen and
Celestine were not present when Johnson and Sauerwin first
discussed the accident, but they eventually came into the galley
while Johnson and Sauerwin were filling out the report.[81]  In

---

[75] Deposition Testimony of Kevin Ahysen.

[76] Testimony of Louis Celestine.

[77] Testimony of Leroy Johnson.

[78] Testimony of Leroy Johnson.

[79] *Id.; see also* Testimony of Kelly Sauerwin.

[80] *Id.*

[81] Testimony of Leroy Johnson.

that report, Johnson stated that he injured his back after Celestine tripped while Johnson and Celestine were moving the crossover hose.[82]  During the process of filling out the accident report, Johnson twice described the accident to Sauerwin in the same manner.[83]  Neither Ahysen nor Celestine, who were both within earshot at this time, disputed Johnson's description of the accident.[84]

**F.   Johnson's Jones Act Negligence Claim**

Under the Jones Act, a seaman's employer is liable for damages if the employer's negligence caused the seaman's injury. *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 335 (5th Cir. 1997).  The fundamental duty of a Jones Act employer is to provide his seaman employees with a reasonably safe place to work.  *Colburn v. Bunge Towing*, Inc., 883 F.2d 372, 374 (5th Cir. 1989).  In *Gautreaux*, the Fifth Circuit, sitting *en banc*, clarified that an employer is liable under the Jones Act if the negligence of its employees or agents played "any part, even the slightest" in causing the injury or death for which damages are sought.  *Id*. (citing *Rogers v. Missouri Pacific R. Co.*, 352 U.S.

---

[82] Pl.'s Ex. 1.

[83] Testimony of Kelly Sauerwin.

[84] *Id.*

500, 506 (1957)).  At the same time, the employer's standard of
care is not greater than that of ordinary negligence under the
circumstances.  *Id.* at 339.  In addition, the seaman's duty of
care is not a "slight" duty of care to protect himself from the
employer's negligence.  *Id.*  Rather, the seaman is also obliged
to act "with ordinary prudence under the circumstances," which
include the seaman's reliance on his employer to provide a safe
working environment and the seaman's own experience, training, or
education.  *Id.*

Here, Celestine was negligent in failing to look where he
was going while he was carrying his end of the crossover hose.
Had he not tripped, Johnson undoubtedly would not have been
injured.  Under the Jones Act, Cenac Towing is therefore liable
for Celestine's negligence.

Cenac Towing erroneously asserts that Johnson was
contributorily negligent for deciding to move the crossover hose
without being ordered to do so.  The testimony shows that the
crew members would have been responsible for moving the crossover
hose at some point before product could have been discharged or
loaded while the vessel was at Mobile.  The task was squarely
within the ambit of Johnson's duties as a Cenac Towing tankerman.
Furthermore, Johnson was not contributorily negligent for the
manner in which he carried the crossover hose.  The testimony

17

indicates that Cenac Towing sent mixed messages as to the company's instructions on how to carry a crossover hose.  The company did not have written procedures detailing how to carry a crossover hose, and the company training video's brief footage showing how to carry a crossover hose was not explicit as to whether the hose could or should be carried on an employee's shoulders.  The training video also shows Cenac Towing employees carrying other heavy equipment on their shoulders.[85]

Finally, Cenac Towing contends that Johnson was contributorily negligent for willfully concealing his previous injuries during Cenac Towing's employment application process. In *Brown v. Parker Drilling Offshore Corp.*, the Fifth Circuit confirmed that the existence of the *McCorpen* defense does not automatically taint a Jones Act claim.  410 F.3d 166, 178 (5th Cir. 2005) (citing *McCorpen v, Cent. Gulf S.S. Corp.*, 396 F.2d 547 (5th Cir. 1968)).  Moreover, the Court rejects the argument that if not for Johnson's misrepresentations, this accident would not have happened.  The condition of Johnson's back and neck did not contribute to causing the accident.  That Johnson sustained injuries at least three years before the December 14, 2005 accident does not make him contributorily negligent.

---

[85] Pl.'s Ex. 16.

18

G.   **Johnson's Unseaworthiness Claim**

To establish a claim for unseaworthiness, "the injured seaman must prove that the owner has failed to provide a vessel, including her equipment and crew, which is reasonably fit and safe for the purposes for which it is used.  In addition, the plaintiff must establish a causal connection between his injury and the breach of duty that rendered the vessel unseaworthy." *Boudreaux v. United States of America*, 280 F.3d 461, 468 (5th Cir. 2002) (citing *Jackson v. OMI Corp.*, 245 F.3d 525, 527 (5th Cir. 2001)).  A vessel's unseaworthiness may arise from various circumstances, including defective gear, appurtenances in disrepair, an unfit crew, an improper method of loading cargo, or an insufficient number of workers assigned to perform a shipboard task.  *See Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 499 (1971).  A plaintiff asserting a claim of unseaworthiness need not establish negligence, but bears the burden to show that the unseaworthy condition "played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness." *Phillips v. Western Co. of North America*, 953 F.2d 923, 928 (5th Cir. 1992).  "[D]angerous and uncertain conditions underfoot may constitute transitory unseaworthiness." *Shenker v. United States*, 322 F.2d 622, 626 (2d Cir. 1963).

The Court concluded at trial that Johnson failed to show any evidence of unseaworthiness, and granted judgment as a matter of law against plaintiff on this claim.

**H.   Extent and Causation of Johnson's Injuries**

Johnson brought this action against Cenac Towing on February 22, 2006.[86]  In his complaint, he specifically alleged injuries relating only to his back.[87]  By the time of trial, however, Johnson also alleged that he sustained neck injuries as a result of the December 14, 2005 accident.  Cenac Towing disputed the extent and causation of both the alleged back-related and neck-related injuries.  The Court finds as follows concerning these issues.

On the same day of the accident, Johnson visited the University of South Alabama Medical Center, where he complained of lower back pain and right flank pain, as well as right leg numbness and urinary incontinence.[88]  The hospital discharged him with Ibuprofen and Lortab for pain, Flexeril for muscle spasm and a heating pad for his back.[89]  Johnson did not complain of any

---

[86] R. Doc. 1.

[87] *Id.*

[88] Testimony of Leroy Johnson; *see also* Pl's. Ex. 39, at pp. 5, 7, 15.

[89] *Id.*

neck pain or other problems in his upper extremities.  On December 15, the day after the accident, a Cenac Towing co-worker transported Johnson from Mobile to the Houma Family Practice Clinic in Houma, Louisiana.[90]  During the trip to Houma, Johnson had a telephone conversation with Bourgeois during which Johnson stated that he had wet his pants at the time of the accident and during the car ride to Houma.[91]  At the Houma Family Practice Clinic, Johnson was seen by Dr. Kurt Dantin.[92]  There, he complained of "stiffness to the right side of his lower back radiating to the right lower extremity."[93]  He also complained of episodes of bladder incontinence.[94]  He did not mention any neck pain or neck injury at this time.[95]  Dr. Dantin performed a neurological examination, which returned normal results "except for painful range of motion to his lumbar spine."[96]  Dr. Dantin also ordered an x-ray and an MRI of Johnson's back, the results of which were normal except for some degenerative changes to his

---

[90] *Id.*

[91] Testimony of David Bourgeois.

[92] *Id.; see also* Pl.'s Ex. 40.

[93] Deposition Testimony of Dr. Kirk Dantin.

[94] *Id.*

[95] *Id.*

[96] *Id.*

facet joints and his lumbar spine.[97]  After this visit, Dr. Dantin arranged for Johnson to see a urologist on December 22, 2005.[98]  Johnson did not attend the urological appointment.[99]  He testified that he received a phone call from an unknown individual informing him that his appointment had been cancelled and would be rescheduled after the holidays.[100]

On December 18, 2005, Johnson visited the emergency room at Prevost Medical Center.[101]  Johnson complained of uncontrollable urine and hematuria.[102]  A urinalysis showed that Johnson was experiencing a urinary tract infection.[103]  Johnson was later transported from Prevost Memorial Hospital by ambulance to Our Lady of the Lake Hospital in Baton Rouge that same day.[104]  At Our Lady of the Lake, Johnson complained of urinary incontinence and blood in his urine (hematuria), as well as numbness and burning

---

[97] *Id.*

[98] *Id.; see also* Testimony of Leroy Johnson.

[99] *Id.*

[100] *Id.*

[101] Pre-Trial Order, at p. 25.

[102] Pl.'s Ex. 42, at p. 1.

[103] Testimony of Dr. Susan McSherry.

[104] Pre-Trial Order, at p. 25.

22

to his right flank and thigh and tingling in right leg.[105]
Physicians at Our Lady of the Lake diagnosed Johnson with a
contusion of the abdominal wall, lumbago (low back pain), and
thoracic/lumbosacral neuritis/radiculitis.[106]  The Our Lady of the
Lake physicians told Johnson not to work for three days, with no
restrictions thereafter.[107]  Additionally, Our Lady of the Lake
referred Johnson to his primary care physician should he want to
seek any restrictions beyond that three-day period.[108]

    On January 4, 2006, Johnson sought medical treatment from
Dr. Morteza Shamsnia, a neurologist.  He complained of low back
pain, difficulty controlling his bladder, and inability to have
an erection since the date of the accident.[109]  Dr. Shamsnia noted
muscle spasm in the lumbosacral region, as well as limitation of
flexion and extension and loss of lordosis.[110]  Dr. Shamsnia also
noted the following impressions from Johnson's visit: low back

_____

[105] Pl.'s Ex. 44.

[106] *Id.*

[107] *Id.*

[108] *Id.*

[109] *See* Pl.'s Ex. 48.  Dr. Shamsnia was unexpectedly
unavailable to testify at trial.  Dr. Shamsnia's medical records
were admitted into evidence at trial without objection.

[110] *Id.*

pain, paresthesia in the lower limb, impotence and incontinence.[111]  She recommended EMG/NCV/DEP of the lower extremities and a Stand-Up MRI with flexion and extension.[112]  She instructed Johnson not to work until further notice.[113]  Johnson did not complain of neck pain during this visit.  On February 3, 2006, Johnson underwent a lumbar MRI.[114]  The results indicated a loss of lumbar lordosis, possibly due to muscle spasm and bulging of the L1-2, L-2-3, L3-4, L4-5, and L5-S1 intervertebral discs without definite nerve root effacement.[115]  Thus, up until early February 2006, Johnson had complained only of back pain, urinary incontinence and erectile dysfunction.  Johnson had not experienced or complained of neck pain on any occasion after the December 14, 2005 offshore accident.[116]

Then, on February 6, 2006, Johnson was involved in a serious motor vehicle accident.  The driver of a stolen vehicle traveling on Louisiana Highway 308 crossed the centerline and struck

---

[111] *Id.*

[112] *Id.*

[113] *Id.*

[114] *See* Pl.'s Ex. 49.  This exhibit was admitted at trial.

[115] *Id.*

[116] Testimony of Leroy Johnson.

24

Johnson's vehicle in a near head-on collision.[117]  Johnson was placed on a spine board and taken from the scene by ambulance to Prevost Memorial Hospital.[118]  At Prevost, Johnson complained of neck pain and pelvic pain and was examined for a possible C-4 neck fracture.[119]  Emergency room personnel told Johnson not to move and to remain on a medical stretcher because the emergency room doctor believed he may have had a broken neck and could be paralyzed if he moved.[120]  Johnson was then transported from Prevost to Our Lady of the Lake Hospital by ambulance for evaluation of a possible C4 neck fracture.[121]

Johnson filed this lawsuit two weeks later on February 22, 2006, in which he alleged that Cenac Towing's negligence resulted in "serious injuries to his back."[122]  The complaint does not allege that Johnson sustained any neck injuries because of the December 14, 2005 offshore accident.  Johnson never amended his complaint to include allegations that the offshore accident

---

[117] Def.'s Ex. 10.

[118] Def.'s Ex. 18, at pp. 3-4.

[119] Def.'s Ex. 17, at pp. 9-10.

[120] Def.'s Ex. 17, at p. 10.

[121] Def.'s Ex. 18, at pp. 7-8.

[122] R. Doc. 1.

resulted in injuries to his neck.

After Johnson filed his complaint, he continued to receive medical treatment for his low back pain, as well as for his urinary incontinence and erectile dysfunction.  For the low back pain, Dr. Shamsnia prescribed Soma and Vicodin, as well as a back brace, and recommended that Johnson not work until further notice.[123]  Johnson also underwent an MRI of his lumbar spine on two occasions, in April and August of 2006.[124]  Both MRIs showed bulging of the L5-S1 intervertebral disc.[125]  Johnson eventually received an epidural steroid injection and facet block at the L5-S1 level on October 30, 2006.[126]  Johnson's back condition, however, does not and will not require surgery.[127]

The Court finds that the low back pain caused by this accident was the result of an aggravation of a pre-existing back condition stemming from Johnson's 2001 maritime accident.  After the 2001 accident, Johnson was diagnosed with a bulging disc at the L5-S1 level, a condition that did not require surgery.

---

[123] Pl.'s Ex. 48, at p. 9.

[124] Pl.'s Ex. 50 & 51.

[125] *Id.*

[126] Testimony of Dr. Bradley Bartholomew.

[127] *Id.*

Johnson received an epidural steroid injection for his low back
pain.  As a result of the 2005 offshore accident, Johnson once
again was diagnosed with a bulging disc in his lower back at the
L5-S1 level, and received an epidural steroid injection.[128]
Johnson testified that he continues to suffer from low back pain
and the Court finds that he will, more likely than not, continue
to experience some low back pain in the future.  Dr. Bartholomew
testified that Johnson has a permanent partial disability rating
of zero to three percent for his back.  Because Johnson was able
to return to heavy work after about a year following similar
injuries in 2001, the Court credits the zero percent estimate and
finds that the low back injury is not disabling beyond Johnson's
inability to work up until the date of trial, which was
approximately one year after this accident.

The Court, however, finds that the December 14, 2005
accident did not cause Johnson's neck injuries.  It was not until
after Johnson's February 6, 2006 motor vehicle accident that he
complained of any neck pain or upper extremity problems.  On
February 14, 2006, Johnson sought treatment from Dr. Bradley
Bartholomew, a neurosurgeon, for the neck pain he began to

---

[128] Testimony of Dr. Bradley Bartholomew; Testimony of Dr.
Anthony Ioppolo.

experience following the motor vehicle accident.[129]  During his
visit with Dr. Bartholomew, Johnson filled out a "Patient
Personal History" form.[130]  Johnson was asked "Is this a work
related injury?" to which he responded "No."[131]  Johnson was then
asked the date of his injury, to which he responded "2-6-06."[132]
Johnson also filled out a form entitled "Accident Related."[133]
Johnson was asked on that form "When did your pain start?" to
which he responded "Neck (crack sound then stinging)."[134]  Asked
"Where did the pain start?" he responded "At scene."[135]  The form
also contained a section titled "Your Pain Rating Is:" that
included the question "Original cause of pain or problem:" to
which Johnson responded "car wreck."[136]  The next question asked
"How long have you been in pain" to which Johnson responded "one
week."[137]  This was the first time since the December 14, 2005

_____

[129] Testimony of Leroy Johnson; *see also* Def.'s Ex. 14.

[130] *Id.* at p. 103.

[131] *Id.*

[132] *Id.*

[133] *Id.* at p. 104.

[134] *Id.*

[135] *Id.*

[136] *Id.* at p. 106.

[137] *Id.*

accident that Johnson complained of neck pain to a medical professional.

Ultimately, after Johnson underwent x-rays and an MRI scan on his cervical spine in April 2006, Dr. Bartholomew performed an anterior cervical discectomy and fusion at C4-C5 and C5-C6 levels with anterior cervical plating on May 31, 2006.[138] Significantly, Dr. Bartholomew wrote up this surgical procedure as not related to Johnson's employment on the health insurance claim forms that his office submitted to Johnson's insurer, Blue Cross Blue Shield of Louisiana.[139] Johnson also signed these forms, representing that his neck surgery was not related to his employment with Cenac Towing. Furthermore, Dr. Bartholomew also wrote up his post-operative follow-up consultation with Johnson on June 15, 2006 as not related to Johnson's employment on the health insurance claim forms that his office submitted to Blue Cross Blue Shield of Louisiana.[140] Thus, up until at least mid-June, six months after Johnson's offshore accident, Dr. Bartholomew believed that Johnson's neck pain was related to the February 6, 2006 motor vehicle accident, not his earlier offshore accident.

---

[138] Testimony of Dr. Bradley Bartholomew.

[139] Def.'s Ex. 7, at pp. 74-75.

[140] *Id.* at p. 88.

It was not until after the June 15 visit that Dr.
Bartholomew changed his opinion regarding the cause of Johnson's
neck pain.  Dr. Bartholomew testified that he now believed the
December 14, 2005 offshore accident caused Johnson's neck
injuries because Johnson reported to him after the May 31 surgery
that his bladder incontinence had completely resolved.[141]  Because
Johnson had told him that his bladder incontinence began
immediately following the offshore accident, Dr. Bartholomew
connected the offshore accident with Johnson's cervical
surgery.[142]  The Court, however, does not find Dr. Bartholomew's
opinion on this issue to be credible.  The only basis for his
opinion was Johnson's representations about his incontinence
problem.[143]  Johnson, however, stated at his deposition on August
14, 2006 that he was still experiencing urinary incontinence.[144]
When asked about this statement at trial, Johnson affirmed that
he was still experiencing incontinence as of August, even though
he had just testified that he did not have bladder problems after

---

[141] Testimony of Dr. Bradley Bartholomew.

[142] *Id.*

[143] *Id.*

[144] Deposition Testimony of Leroy Johnson.

his neck surgery.[145]  The contradictory nature of Johnson's testimony as to his bladder problems after the neck surgery leads the Court to conclude that any medical opinion offered solely based on Johnson's subjective representations is inherently unreliable.

Finally, the Court does not find credible the expert opinion of Dr. Susan McSherry, Johnson's urologist, who diagnosed him with a neurogenic atonic bladder and neurogenic erectile dysfunction as a result of the December 14, 2005 accident, which meant that both conditions were related to a malfunction somewhere in the nervous system.[146]  Her attempt to link Johnson's bladder incontinence and erectile dysfunction with a spinal cord injury stemming from the December 2005 accident were discredited by defendant's expert urologist, Dr. Neil Baum.  First, Dr. McSherry relied on a March 30, 2006 urodynamics study to conclude that Johnson had an atonic bladder, or poor compliance with high pressure.[147]  This study, however, was flawed.  As Dr. Baum pointed out, the maximum infused volume figure and the infused volume figure should have been the same.  Instead, the study

---

[145] Testimony of Leroy Johnson.

[146] Testimony of Dr. Susan McSherry.

[147] *Id.*

reported the maximum figure as 356 ml. and the infused figure as 338 ml.[148]  Additionally, even though Dr. McSherry reported that Johnson was unable to void and the flow time is reported as zero seconds, the study indicates that the average flow rate was 359.8 ml/s.[149]  Dr. Baum found that these inconsistencies made it difficult to draw any significant conclusions from its results.[150]  Second, Dr. McSherry based at least part of her neurogenic bladder diagnosis on Johnson's own representations as to his bladder control.  For the reasons discussed earlier, the Court finds any opinion based on these representations inherently unreliable.

The Court therefore finds that Johnson did not injure his neck in the offshore accident.  As such, Johnson's neck injuries, and corresponding medical bills to that end, are unrelated to this dispute.

Finally, the Court credits the testimony of Dr. Anthony Ioppolo, defendant's neurosurgery expert, who stated that the December 14, 2005 accident could have exacerbated Johnson's pre-existing urinary incontinence and erectile dysfunction

---

[148] Pl.'s Ex. 53, at p. 14.

[149] *Id.*

[150] Testimony of Dr. Neil Baum.

problems.[151]  Johnson initially complained of both problems in
2001 following his Adams Land & Marine accident, but he was
asymptomatic from 2001 until the December 14, 2005 offshore
accident.[152]  The Court therefore finds that to the extent Johnson
experienced some form of bladder incontinence and erectile
dysfunction following the December 14, 2005 offshore accident,
those conditions were the result of an aggravation of Johnson's
pre-existing back condition dating from his 2001 maritime
accident.  His erectile dysfunction has not improved since he
first reported the problem after the Cenac Towing accident.[153]

### I.   Johnson's Maintenance and Cure

Seamen have a right to maintenance and cure[154] for injuries
suffered by them in the course of their duties on a vessel.  *See
O'Donnell v. Great Lakes Dredge & Dock Co.*, 318 U.S. 36, 41-42
(1943); *Guevara*, 59 F.3d at 1499.  Before plaintiff can recover
maintenance and cure, he bears the burden of alleging and proving
the following facts: (a) his engagement as a seaman, (b) that his

---

[151] Deposition Testimony of Dr. Anthony Ioppolo.

[152] Testimony of Leroy Johnson.

[153] Testimony of Dr. Susan McSherry.

[154] Maintenance is a daily stipend for living expenses; cure
is the payment of medical expenses.  *See Guevara v. Maintenance
Overseas Corp.*, 59 F.3d 1496, 1499 (5th Cir. 1995).

illness or injury occurred, was aggravated or manifested itself while in the ship's service, (c) the wages to which he may be entitled, and (d) the expenditures or liability incurred by him for medicines, nursing care, board and lodging. *See Foster, III v. Brian's Trans. Serv. et al.*, 1993 WL 114528, *2 (E.D. La. April 8, 1993) (citing MARTIN NORRIS, 2 THE LAW OF SEAMEN § 26.21 at 53 (Supp. 1992)). A plaintiff need not present any proof of negligence or fault on the part of the employer to establish his entitlement to maintenance and cure. *See id.*

Maintenance and cure may be awarded "even where the seaman has suffered from an illness pre-existing his employment." *McCorpen*, 396 F.2d at 548. Nevertheless, "there is a general principle that it will be denied where he knowingly or fraudulently conceals his illness from the shipowner." *Id.*; *Bodden v. Professional Divers of New Orleans, Inc.*, 2001 WL 1223589, at *2 (E.D. La. Oct. 12, 2001). Specifically, when the shipowner requires a prospective seaman to undergo a pre-hiring medical examination, and the seaman either intentionally misrepresents or conceals material medical facts, then the seaman is not entitled to an award of maintenance and cure. *See McCorpen,* 396 F.2d at 549. The shipowner is entitled to this defense only when (1) the seaman has intentionally misrepresented or concealed medical facts; (2) the misrepresented or concealed

facts were material to the employer's hiring decision; and (3) there exists a causal link between the pre-existing disability that was concealed and the disability incurred during the voyage. *McCorpen*, 396 F.2d at 549; *see also Brown*, 410 F.3d at 171. Here, the Court finds that Cenac Towing established each one of these elements by a preponderance of the evidence.

       1.   *Intent to conceal*

    As discussed above, Cenac Towing's employment application asked Johnson: "Do you have any physical or mental condition(s) which may interfere with or hinder the performance of the job for which you wish to be considered?  If so, please explain." Johnson responded "No."[155]  On both of the employment applications, Johnson was also asked: "Have you ever had an on the job injury?"  He responded "No."[156]  On both of the employment applications, Johnson was provided space to describe any "on the job" injuries that he might have sustained.  Each time, he wrote "N/A" in that space.[157]

    Before both of his periods of employment with Cenac Towing, Johnson underwent a pre-employment medical examination that

---

[155] Def.'s Ex. 2 & 3.

[156] *Id.*

[157] *Id.*

included a physical exam, a range of motion test and a back x-ray.[158]  As part of these pre-employment physicals, medical personnel asked Johnson a series of questions.[159]  Johnson responded to the question "Hurt your back?" by checking "No."[160] Johnson responded to the question "Had surgery?" by checking "Yes" and explaining that he had a shoulder A/C joint injury in 1987.[161]  Johnson responded to the question "Received disability compensation?" by checking "No."[162]

The Fifth Circuit held in *Brown v. Parker Drilling* that the intentional concealment prong of *McCorpen* "is an essentially objective inquiry."  410 F.3d at 174.  The Court has no difficulty concluding here that each of Johnson's answers described above were untruthful or were otherwise misrepresentations based on Johnson's actual medical history. Furthermore, even though the intentional concealment prong does not require a subjective determination under *Brown v. Parker Drilling*, the Court notes that Johnson admitted at trial that he

---

[158] Testimony of Leroy Johnson; Testimony of David Bouregeois.

[159] Def.'s Ex. 4 & 5

[160] *Id.*

[161] *Id.*

[162] *Id.*

intentionally concealed from Cenac Towing and its medical
personnel his earlier injuries and disabilities when he applied
for the tankerman position in 2003.[163]

     2.  *Materiality*

Cenac Towing certainly established the materiality of
Johnson's answers.  As the Fifth Circuit stated in *Brown v.
Parker Drilling*, "[t]he fact that an employer asks a specific
medical question on an application, and that the inquiry is
rationally related to the applicant's physical ability to perform
his job duties, renders the information material for the purpose
of this analysis."  410 F.3d at 175.  Dr. Mark Walker, who
administered plaintiff's two physical examinations on behalf of
Cenac Towing, stated that had he known of plaintiff's 1994 and
2001 accidents, he would not have approved plaintiff for
employment because of "the possibility of further endangering
himself in any kind of way . . . in this case his neck and his
back and to try to protect others around him."[164]  Cenac Towing
therefore has shown by a preponderance of the evidence that
Johnson's answers were material to its hiring decision.

     3.  *Causation*

---

[163] Testimony of Leroy Johnson.

[164] Deposition Testimony of Dr. Mark Walker.

Under the causation prong, the employer must establish a connection between the intentional misrepresentation of medical facts and the injury that is eventually sustained. *See Brown*, 410 F.3d at 175. The evidence clearly shows such a connection in this case. In the 2001 maritime accident that Johnson did not report to Cenac Towing or its medical personnel during the employment application process, Johnson suffered an injury to his lower back, which was diagnosed as a bulging disc at the L5-S1 level. Johnson sustained his current injury to the same area of his back. Each of three MRIs of his lumbar spine that Johnson underwent after the 2005 offshore accident revealed a bulging disc at the L5-S1 level. After both accidents, Johnson received an epidural steroid injection for his low back pain. Under similar facts, the Fifth Circuit found in *Brown v. Parker Drilling* that the defendant had established a causal link because plaintiff's injuries were to the same location of the lumbar spine. *Id.* at 176. While Johnson may have sustained other back-related injuries in the 2005 accident, "there is no requirement that a present injury be identical to a previous injury." *Id.* The Court therefore finds that Cenac Towing established a causal link between Johnson's misrepresentations and his injuries. As a result, Cenac Towing has met all three prongs of the *McCorpen* defense, and Johnson is thus not entitled to maintenance and cure

38

benefits.

## II.  DAMAGES

Under the Jones Act, a plaintiff may recover all of his pecuniary losses.  *Cruz v. Hendy Int'l Co.*, 638 F.2d 719, 723 (5th Cir. 1981), *rev'd on other grounds by Michel v. Total Transportation, Inc.*, 957 F.2d 186, 191 (5th Cir. 1992). Pecuniary losses may include loss of earning capacity, medical expenses, and pain and suffering resulting from an injury caused by negligence and/or unseaworthiness.  *Daigle v. L & L Marine Trans. Co.*, 322 F. Supp. 2d 717, 730 (E.D. La. 2004).

### A.  Past and Future Wage Loss

Johnson is entitled to any wages he would have earned had he continued to work as a tankerman through the date of trial, less (1) any wages he was paid by Cenac Towing; and (2) any wages he could have earned despite his physical condition.  *See Daigle*, 322 F. Supp. 2d at 731 (subtracting amounts earned after plaintiff's injury from his past loss); *In re: Diamond B Marine Svcs., Inc.*, 2001 WL 1164914, *18 (E.D. La. 2001) (holding that allowing recovery for wages paid by plaintiff's employer would amount to "double recovery"); *Crum v. United States of America*, 2000 WL 943253, *3 (E.D. La. 2000) (finding that where an injury did not prevent the plaintiff from returning to work, he was not

entitled to past wages).  Johnson's accident took place on December 14, 2005.  The Court finds that Johnson was unable to work from the date of his accident through December 4, 2006, which was the date of trial.  Johnson is therefore entitled to wages he would have earned had he been able to work as a tankerman for Cenac Towing from December 14, 2005 through December 4, 2006.  Plaintiff's expert estimated Johnson's loss between accident and trial to be $27,371 after taxes.[165] Defendant's expert estimated Johnson's loss between accident and trial to be $31,499.25 after taxes, based on his estimate of Johnson's earnings during the last twelve months of employment pre-accident.[166]  The Court credits the estimate of defendant's expert, as it takes into account a more representative figure for Johnson's annual pre-tax income base.  Because Johnson was already paid $1,497.29 for work between December 14, 2005 and December 29, 2005, the Court finds that he is entitled to $30,001.96 in past wage loss through the date of trial.

However, the Court finds that Johnson is not entitled to any future lost wages because the injuries he sustained aboard the URSULA CENAC were not of such a debilitating nature.  It was only

---

[165] Pl.'s Ex. 57.

[166] Def.'s Ex. 23.

as a result of his subsequent car accident and attendant neck injury that Johnson became incapacitated from performing similar work in the future.  The Court has already found that Cenac Towing is not liable for Johnson's neck injury.  Therefore, the Court does not award Johnson any future lost wages.

**B.    Pain and Suffering**

In this case, Johnson has suffered physical pain and mental distress associated with his back injury and incontinence.  He has also suffered mental distress as a result of his erectile dysfunction.  He is unable to engage in some of the activities he enjoyed before he was injured in the December 14, 2005 accident, and his relationship with his wife has been affected by its consequences.  For all these reasons, the Court finds that Johnson is entitled to an award of $60,000 for pain and suffering.  Based on the testimony at trial, the Court apportions this as follows: $30,000 for past pain and suffering and $30,000 for future pain and suffering.

**C.    Past and Future Medical Expenses**

Johnson is entitled to medical expenses relating to his back injury, incontinence, and erectile dysfunction, which were at least aggravated by the December 14, 2005 accident.  Johnson has submitted medical bills for his back injuries totaling

$33,698.19.[167]  Johnson has submitted medical bills for his
urological conditions totaling $4,397.61.[168]  Cenac Towing
contends that Johnson cannot recover for his medical expenses
that have already been paid by Blue Cross Blue Shield of
Louisiana.  However, the collateral source rule "bars a
tortfeasor from reducing the quantum of damages owed to a
plaintiff by the amount of recovery the plaintiff receives from
other sources of compensation that are independent of (or
collateral to) the tortfeasor."  *Davis v. Odeco, Inc.*, 18 F.3d
1237, 1243 (5th Cir. 1994).  "Sources of compensation that have
no connection to the tortfeasor are inevitably collateral."  *Id.*
at 1244.  When the employee "has bargained for a fringe benefit
as additional consideration for employment, compensation received
by the employee under that fringe benefit should not be deducted
from damages awarded to the employee as a result of the
employer's negligence."  *Id.*  Furthermore, "the ultimate inquiry
remains whether the tortfeasor established the plan as a
prophylactic measure against liability."  *Id.*  Here, Blue Cross,
a third party, covered Johnson's medical bills under the terms of
his general health insurance plan, which was part of his employee

---

[167] Pl.'s Post-Trial Ex. 1.

[168] Pl.'s Post-Trial Ex. 2.

benefits package.  Johnson's health insurance plan was not established to protect the company against tort liability.  The Court therefore finds that the payments made by Blue Cross are a collateral source.  Johnson is entitled to $38,095.80 in past medical bills.

As Johnson failed to establish what, if any, future medical treatment he will need as a result of his back injury, erectile dysfunction, or bladder incontinence, the Court does not award Johnson any future medical expenses.

Finally, because the Court finds that Johnson's neck injury is not related to his December 14, 2005 offshore accident, he is not entitled to any medical expenses relating to his neck.

### D.   Past and Future Loss of Meals

The Court accepts the figure of $2,129 for the value of lost meals from the time of the accident to the date of trial as part of Johnson's expected benefits from employment.[169]  Johnson also seeks $44,730 for the value of future lost meals.[170]  Because the Court finds that Johnson would not have been incapacitated beyond the date of trial if he had not been injured in the February 6, 2006 motor vehicle accident, the Court does not award Johnson the

---

[169] Pl.'s Ex. 57.

[170] *Id.*

43

value of future lost meals.

### E.   Loss of Other Benefits

Johnson also seeks compensation for the loss of medical, dental, and retirement benefits he received as part of his Cenac Towing compensation package.  Johnson's expert places the future value of these lost benefits at $117,510.[171]  Johnson's expert did not provide a value for lost benefits between the date of the accident and the date of the trial, nor was there evidence presented at trial in this regard.  Because the Court finds that Johnson would not have been incapacitated beyond the date of trial if he had not been injured in the February 6, 2006 motor vehicle accident, he is not entitled to compensation for the future loss of fringe benefits.

### F.   Pre-judgment Interest

In admiralty, the court has the discretion to award pre-judgment interest.  There is a strong presumption in favor of awarding pre-judgment interest, and it will usually be denied only in cases in which the plaintiff exercised undue delay in bringing his action.  *U.S. v. Ocean Bulk Ships, Inc.*, 248 F.3d 331, 344 (5th Cir. 2001).  When a Jones Act case is tried to a jury, the Court may not award pre-judgment interest, but when a

---

[171] *Id.*

Jones Act case is tried to the Court, it may award pre-judgment interest. *McPhillamy v. Brown & Root*, 810 F.2d 529, 532 (5th Cir. 1987); *Bush v. Diamond offshore Co.*, 46 F. Supp. 2d 515, 523 (E.D. La. 1999).  It is within the discretion of the Court to select an equitable rate of pre-judgment interest. *Hansen v. Continental Ins. Co.*, 940 F.2d 971, 984 (5th Cir. 1991).  The Court finds no delay here and that the plaintiff is thus entitled to receive pre-judgment interest at 4.95 percent, which is the most recently quoted rate for one year constant-maturity treasury bills, from the date of judicial demand until the date of payment.  Pre-judgment interest may be awarded only on damages that have actually accrued as of the date of judgment. *Martin v. Walk, Haydel & Assocs.*, Inc., 794 F.2d 209, 212 (5th Cir. 1986). Accordingly, Johnson may receive pre-judgment interest only on past damages, not future damages.  In this case, he is entitled to pre-judgment interest on past lost wages, past medical expenses, past loss of meals, and past pain and suffering.

## III. SUMMARY

On the basis of the foregoing findings of fact and conclusions of law, the Court finds that the plaintiff, Leroy Johnson, has sustained damages due to the negligence of Cenac Towing.  Accordingly, the plaintiff is entitled to recover from

the defendant the following damages:

|   | | |
|---|---|---|
| A. | Past wage loss: | $30,001.96 |
| B. | Past pain and suffering: | $30,000 |
| C. | Future pain and suffering: | $30,000 |
| D. | Past medical expenses: | $38,095.80 |
| E. | Past lost meals: | $2,129 |
| | Total Damages: | $130,226.76 |

Because plaintiff was not found contributorily negligent, Cenac Towing will bear the entire cost of the judgment. Johnson is entitled to pre-judgment interest on past damages from the date of judicial demand until the date paid, and he is entitled to post-judgment interest on all remaining damages from the date of judgment until the date paid. Both pre- and post-judgment interest is to be calculated at a 4.95 percent per annum rate.

New Orleans, Louisiana, this 27th day of December, 2006.

_Sarah Vance_
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE